# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

PAULA W.,

    *Plaintiff,*

v.

FRANK BISIGNANO, Commissioner of
Social Security,

    *Defendant.*

Case No. 1:25-cv-01279-RLH

## ORDER & OPINION

Plaintiff Paula W. ("Paula") filed this suit to challenge an administrative law judge's finding that she was not disabled under the Social Security Act and thus ineligible for benefits. The parties have consented to final disposition by a U.S. Magistrate Judge. (Doc. 9.) Because the ALJ's decision was supported by substantial evidence, the Commissioner's decision will be affirmed.

## LEGAL STANDARD

### I.    The Social Security Act

The Social Security Act—and the regulations adopted under it—explain in detail who is eligible to receive social security benefits. To qualify, a claimant must be sixty-five years of age, blind, or disabled. 20 C.F.R. § 416.202(a)(1)–(3). A claimant is disabled if she cannot "do any substantial gainful activity" because she suffers from "any medically determinable physical or mental impairment" that is either life-threatening or chronic. 42 U.S.C. § 423(d)(1)(A).

To implement that definition, the Social Security Administration has developed a five-step evaluation process. *See* 20 C.F.R. § 416.920(a)(1). The steps proceed sequentially:

**Step One.** Is the claimant currently engaged in substantial gainful activity?

**Step Two.** Does the claimant have a severe mental or physical impairment—i.e., an impairment that significantly limits their ability to do basic work activities—or a combination of them?

**Step Three.** Does the mental or physical impairment appear on an enumerated list (called "listings")? If not, is it nonetheless medically equal to one of those listings?

**RFC Assessment.** What is the claimant's residual functional capacity (RFC)—that is, the most they can still do despite their limitations?

**Step Four.** Based on the claimant's RFC, can they perform their past work?

**Step Five.** Based on the claimant's RFC, can they perform other work?

*See id.* § 416.920(a)(4)(i)–(v). The ALJ begins, of course, at step one. If it yields an affirmative answer (i.e., the claimant is working), the claimant is not disabled, and the inquiry ends. If step two yields a negative answer (i.e., the claimant does not have a severe impairment), the claimant is not disabled, and the inquiry ends. *See id.* §416.920(a)(4)(i)–(ii). Step three, however, is dispositive: If the claimant's impairment appears on a listing, the claimant is considered disabled and eligible for benefits. *See id.* § 416.920(a)(4)(iii). If the claimant's impairment does not appear on or medically equal a listing, the ALJ crafts an "RFC Assessment," which analyzes "the claimant's ability to do physical and mental work activities on a regular and continuing basis despite limitations from [their] impairment." *Moore v. Colvin,* 743 F.3d 1118, 1121

(7th Cir. 2014). If either steps four or five yield an affirmative answer (i.e., the claimant can perform their old job or adjust to a new one in light of the RFC), the claimant is not disabled. *See* 20 C.F.R. § 416.920(a)(4)(iv)–(v).

The claimant has the burdens of production and persuasion through step four. *See Wilder v. Kijakazi*, 22 F.4th 644, 651 (7th Cir. 2022). At step five, the burden shifts to the Commissioner to show that the claimant can engage in some type of substantial gainful employment. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

## II.    Standard of Review

A court's function on review is limited to determining whether the ALJ's findings are supported by substantial evidence and based upon proper legal criteria. *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). Substantial evidence, in turn, is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (explaining that the threshold "is not high"); *Schneck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) ("Substantial evidence may be less than the weight of the evidence, and more than a scintilla." (citation modified)). Yet, while the ALJ's decision commands deference, courts may not simply "rubber stamp" it. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).

The Seventh Circuit has emphasized that ALJs are "subject to only the most minimal of articulation requirements" and "need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning." *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024). Instead, ALJs need only "provide an explanation for how the evidence leads to their conclusions that is 'sufficient to allow . . . a reviewing court, to assess the validity of the agency's ultimate findings and afford [the plaintiff] meaningful judicial review.'" *Id.* at 1054 (alteration in original) (quoting *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014)). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary"—not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). Therefore, courts reviewing for substantial evidence may not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [their] judgment for the ALJ's determination so long as substantial evidence supports" the decision under review. *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). In short, the ALJ must build "an accurate and logical bridge" between the evidence in the record and his conclusions. *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013).

4

# BACKGROUND

## I.    Paula

Paula was born in 1982, (R. at 366[1]), and has received her GED, (R. at 498). She previously worked as a caretaker, a gas station attendant, a school cafeteria employee, and hotel housekeeper. (R. at 46–48.) Paula alleged that she was disabled and thus unable to sustain full time employment primarily because of knee pain, insomnia, and depression. (R. at 49–50.) She testified that she has trouble gripping objects with her hands, that her pain affects her focus, and that she experiences auditory hallucinations. (R. at 51–54.) She also testified that her daily routine consists primarily of watching TV and that her daughter assists with most household chores. (R. at 50–51.)

## II.    Procedural History

Paula applied to the Social Security Administration for supplemental security income and disability benefits in July 2019, alleging that she has been disabled since May 10, 2019. (R. at 13.) Her application was initially denied in February 2021 and denied upon reconsideration in January 2022. (R. at 13.) She then requested a hearing before an ALJ, (R. at 13), which took place in June 2022, (R. at 37).

After the hearing, the ALJ issued a written opinion concluding that Paula was not disabled and therefore not entitled benefits. (R. at 31.) In response, Paula sought review of the ALJ's decision with the Appeals Council, who denied her request for

---

[1] "R." refers to the Certified Administrative Record filed on September 9, 2025. (Doc. 7.) The page numbers cited in this Order refer to the black page numbers at the bottom right of each page of the transcript rather than the green page numbers generated automatically by CM/ECF at the top right.

review. (R. at 1.) Paula then filed a complaint in this Court to challenge the ALJ's decision. (R. at 1118.) The parties jointly moved to remand Paula case back to the Commissioner. (R. at 1124.) This Court granted that motion and directed the ALJ to hold further proceedings and "evaluate the evidence, including opinion evidence; assess [Paula's] residual functional capacity and whether she could perform her past relevant work or work existing in the national economy; and issue a new decision." (R. at 1122.) The case made its way back to the Appeals Council, who vacated the ALJ's previous decision and instructed him to reevaluate the opinion of state-agency psychologist, Dr. Howard Tin. (R. at 1131.) The Appeals Council also instructed the ALJ to consider, in greater depth, (1) the opinion evidence, (2) Paula's RFC, (3) Paula's past relevant work, and (4) obtain supplemental testimony from a vocational expert about the number of jobs in the national economy. (R. at 1131–32.)

On remand, the ALJ held another hearing, but Paula failed to appear. The ALJ then issued an order to show cause, and Paula responded by explaining that she had obtained a new phone number. (R. at 1003.) The ALJ found good cause for the non-appearance, held a supplemental hearing, and issued a second written opinion in March 2025. (R. at 1002–1042.) The ALJ again concluded, however, that Paula was not disabled and thus not eligible for benefits. (R. at 1042.) Rather than asking the Appeals Council to review that decision, Paula filed a complaint in this Court. *See* 20 C.F.R. § 404.984 (authorizing that practice). She filed her opening brief in October 2025, (Doc. 10), the Commissioner responded, (Doc. 12), and Paula replied, (Doc. 13).

### III.   The ALJ's Decision

In his opinion, the ALJ used the five-step evaluation process outlined above to determine whether Ronald was disabled. At step one, he determined that Paula has not engaged "in substantial gainful activity" since May 10, 2019—the date Paula alleged she became disabled. (R. at 1005.) At step two, the ALJ found that Paula had the following severe impairments: (1) disorder of the spine; (2) obesity; (3) arthritis of the knees; and (4) depression with anxiety. (R. at 1006.) At step three, the ALJ concluded that none of those impairments met or medically equaled any of the listed impairments. (R. at 1007–13.) Before proceeding to steps four and five, the ALJ crafted the following RFC assessment:

> [Paula] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except no climbing of ladders, ropes, or scaffolds; no more than occasional climbing of ramps or stairs, balancing, stooping, kneeling, crouching, or crawling; no more than frequent reaching, handling, fingering or feeling; need to avoid environmental hazards such as unprotected heights and dangerous machinery; need to avoid concentrated exposure to vibration and to loud and very loud noises (as defined in the SCO); limited to understanding, remembering and carrying out simple instructions; and can make simple work-related decisions with only occasional changes to a routine work setting.

(R. at 1013.) At step four, the ALJ found that Paula had no past relevant work. (R. at 1037.) Finally, at step five, the ALJ concluded that Paula—based on her age, education, work experience, and RFC—could perform jobs that exist in significant numbers in the national economy. (R. at 1901.) Examples of those jobs included surveillance system monitor, document preparer, call-out operator, and order taker. (R. at 1038.) Based on the ALJ's conclusion at step five, he determined that Paula is not disabled. (R. at 1042.)

## DISCUSSION

Paula makes two arguments. First, she argues that the ALJ failed to solicit another medical opinion to interpret new medical evidence. But the new evidence did not radically change the picture of Paula's medical conditions, so the ALJ was not required to solicit another opinion to interpret it. Second, Paula argues that the ALJs failed to carry his burden to show that the jobs offered for Paula at step five of the evaluation process was a "significant number of jobs." Although caselaw on this point is across the board, the Court finds that 30,300 jobs was significant.

## I.    Whether the ALJ Was Required to Solicit Another Expert Opinion

When crafting Paula's RFC, the ALJ reviewed two state-agency assessments performed in January 2021 and January 2022. (R. at 1035–36.) He found both to be "of limited persuasive value," however, because they lacked adequate explanation, contradicted each other, and failed to account for "a significant portion of the relevant period." (R. at 1036.) The ALJ also rejected a third medical opinion—that of Dr. Bockewitz—because it provided "no specific rationale or support" for the conclusion that Paula's pain was so severe that it prevents her from "perform[ing] even simple work tasks." (R. at 1030.)

Generally, claimants challenge *how* the ALJ analyzed medical opinions. They argue, for example, that the ALJ did not properly apply the regulatory factors when accepting or rejecting a doctor's recommendations. *See, e.g., Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Clifford*, 227 F.3d at 869–71. Or they assert that the ALJ ignored an opinion entirely. *See, e.g., Windus v. Barnhart*, 345 F. Supp. 2d 928, 943

8

(E.D. Wis. 2004). But Paula's brief makes a more subtle point. (Pl. Br. 12–13[2].) She accepts, for the sake of argument, that the ALJ properly rejected the opinions of these three doctors. (Pl. Br. 12–13.) Nonetheless, she observes that she submitted records from Dr. Bockewitz's office in May 2022—five months *after* the final state-agency physician looked at her case. Those records included an MRI of her knee, a referral for orthopedic surgery, and a recommendation for a cane. (Pl. Br. 12.) Because the records were not available to the state-agency physicians, Paula argues, the ALJ was required to solicit the opinion of *another* doctor to review them. By failing to do so, Paula suggests, the ALJ impermissibly "played doctor." The Commissioner responds that the later-submitted evidence did not require the ALJ to solicit another opinion because he "carefully considered the updated evidence and explained the bases for his findings. (Comm'r Br. 5.[3])

Paula relies largely on *Stage v. Colvin*, 812 F.3d 1121 (7th Cir. 2016). The claimant there visited an orthopedic surgeon, who ordered new MRIs that revealed a worsening of the claimant's spinal condition. *Id.* at 1123. Based on those MRI results, the surgeon recommended a total left hip replacement. *Id.* This report—which reflected "significant, new, and potentially decisive findings"—was not reviewed by either state-agency physician. *Id.* Because the report dramatically "changed the picture" of the claimant's conditions, the ALJ erred by dismissing it as inconsequential and by instead relying on the outdated state-agency assessments. *Id.*

---

[2] "Pl. Br." refers to Paula's opening brief, filed on October 8, 2025. (Doc. 10.)
[3] "Comm'r Br." refers to the Commissioner's response brief, filed November 4, 2025. (Doc. 12.)

at 1125. The Court held that the ALJ should have "consult[ed] a physician," rather than "evaluate[] the MRIs and recommendation himself." *Id.*

*Stage* was not a one off. As Paula observes, the result in *Stage* was dictated by Seventh Circuit cases discussing an ALJ's obligation when confronted with medical evidence that post-dates state-agency opinions. In *Kemplen v. Saul*, for example, the claimant submitted two x-rays that were "inconsistent" with the ALJ's findings. 844 F. App'x 883, 887 (7th Cir. 2021). The x-rays showed a worsening of the claimant's condition in her hands, which "contrast[ed] markedly" with the ALJ's finding that the claimant could lift up to twenty pounds. *Id. Kemplen* established the following rule: "the ALJ must seek an additional medical opinion if there is potential decisive evidence that postdates the state agency consultant's opinion." *Id.* at 888. Another case, *Keys v. Berryhill*, applied that standard but reached the opposite result. 679 F. App'x 477 (7th Cir. 2017). There, the claimant argued that the ALJ erred by failing to solicit an additional medical opinion to review two additional MRIs. *Id.* at 481. The Court disagreed: the claimant "did not how explain how the findings on those reports" undermined the ALJ's ultimate findings. *Id.*

All agree that Paula's evidence postdated the state agency opinions because it was submitted five months after they were issued. Thus, Paula's challenge turns on the second prong of *Kemplen*'s formulation: whether the records from Dr. Bockewitz were "potential decisive evidence" that undermined the ALJ's conclusion that Paula was not disabled. 844 F. App'x at 888. Put another way, the Court must determine whether the records "change[d] the picture" of Paula's conditions to such a degree

that the ALJ was required to seek another medical opinion to review them. *Stage*, 812 F.3d at 1125. Paula argues that it did: "the level of severity of Paula's degenerative changes in the left knee was not previously evidenced in the file and led to Dr. Bockewitz prescribing a crutch and a cane and referring her to orthopedic surgery." (Pl. Br. 14.) The Commissioner responds that the ALJ "carefully considered the updated evidence and explained the bases for his findings." (Comm'r Br. 5.)

The evidence in question falls into three categories: (1) Dr. Bockewitz's treatment notes; (2) his recommendations, and (3) the MRI. (Pl. Br. 13–14.) To begin, the ALJ addressed each of these categories. Start with category one—the treatment notes. The ALJ noted that Paula "reported 10/10 pain at the initial visit" with Dr. Bockewitz, but reasoned that this self-report was unpersuasive because Paula's "performance at the examination was wholly inconsistent with her alleged pain level." (R. at 1030) "[I]f she was actually experiencing 10/10 pain . . . on a constant basis," the ALJ elaborated, "she would have been incapable of actively participating in the examinations by Dr. Bockewitz or even engaging in a coherent conversation . . . long enough to explain her symptoms and limitations." (R. at 1030.)

The ALJ also addressed category two—Dr. Bockewitz's recommendations. The ALJ observed that Dr. Bockewitz referred Paula for surgery but that she "wanted a second opinion from another orthopedic surgeon before proceeding with surgery." (R. at 1027.) At the same time, Paula "said that she felt the knee pain was better when she was taking gabapentin three times a day"; Dr. Bockewitz thus issued another referral and "advised [Paula] to continue with conservative treatment." (R. at 1027.)

11

As to the cane recommendation, the ALJ recognized that Dr. Bockewitz prescribed a cane but nonetheless concluded that the record failed "to establish that use of a cane or crutch is medically necessary for ambulation or balance." (R. at 1036.) This was so, the ALJ said, because "the medical records from visits after the cane was prescribed do not document [Paula] being observed using a cane at visits." (R. at 1036.)

Finally, the ALJ discussed category three—the MRI. The ALJ recognized that Dr. Bockewitz performed a left-knee MRI in August 2021. He explained, however, that Paula "had no new injury to the left knee on or around August 2021 that would suggest that the MRI findings represented new or worsening abnormalities." (R. at 1036.) "In fact," the ALJ continued, "the claimant was reporting a much lower degree of pain in August 2021 compared to prior months." (R. at 1036.)

All told, the ALJ addressed each category of Dr. Bockewitz's records that Paula identifies in her brief. He discredited Paula's reports of pain because they were inconsistent with her behavior at the doctors' visits; he discredited the cane prescription because the evidence showed Paula did not use it; and he explained that the MRI was not decisive evidence because no evidence suggested that it was different from previous images of Paula's knee condition.

Nor does the evidence in question materially differ from the evidence that the state-agency physicians *did* review. Indeed, there was ample evidence in the record that bore on Paula's knee condition. Both consultants (and the ALJ) recognized Paula's impairments in her knee. (R. at 1006, 120, 149). And, as the Commissioner observes, the ALJ "reasonably evaluated the record medical evidence" in finding that

12

Paula could perform a restricted range of sedentary work despite her knee condition. (Comm'r Br. 4 (quoting *Jones v. Kijakazi*, No. 3:19-cv-3275, 2022 WL 4537864, at *3 (C.D. Ill. Sept. 27, 2022)).) Some of that medical evidence included other images taken of Paula's knee. For instance, the ALJ discussed the x-rays of Paula's left knee taken on April 9, 2021, which "revealed very small joint effusion but were otherwise unremarkable." And the ALJ repeated Dr. Bockewitz's comment that Paula's x-rays "looked pretty good." (R. at 1025 (quoting R. at 930).) Thus, the evidence Paula submitted in May 2022 did not reflect "significant, new, and potentially decisive findings." *Stage*, 812 F.3d 1123. The ALJ committed no error by failing to seek another medical expert to interpret them. *See Keys*, 679 F. App'x at 481.

In short, this case is more like *Keys* than *Kemplen* and *Stage*. That is because the evidence that Paula invokes does not undermine the ALJ's conclusions, nor does it change the picture of Paula's conditions to such a degree that the ALJ should have sought another expert opinion. *See Stage*, 812 F.3d at 1125. Instead, the ALJ explicitly incorporated the evidence into the ALJ's RFC analysis and explained how he factored it into his discussion. After doing so, he crafted an RFC more restrictive than the state-agency physicians' opinions, but less restrictive than Dr. Bockewitz's. Because a reasonable mind would accept the evidence as sufficient to support that conclusion, the Court's inquiry is at an end. *See Richardson*, 402 U.S. at 401 (defining substantial evidence).

13

## II.    The ALJ's Step-Five Determination

Paula's second argument concerns step five of the sequential evaluation process. She observes that the number of proposed jobs the vocational expert offered—and the ALJ accepted—amounted to roughly 30,000. (Pl. Br. 16.) And she argues that this was not a "significant number." The Commissioner responds that other courts have held 30,000 jobs to be significant, and this Court should too.

To determine whether the ALJ found a significant number of jobs, the Court must first determine how many jobs the ALJ actually found. As Paula explains, the vocational expert's testimony at the supplemental hearing "largely confirmed"—but did not precisely mirror—his testimony at the first. (Pl. Br. 16.) The vocational expert offered five jobs: surveillance system monitor, document preparer, call-out operator, nut sorter, and order taker. (R. at 1038.) And the numbers of each in the national economy were reduced from the first hearing to the second. Specifically, the vocational expert reduced the number of surveillance system monitor positions from 45,000 to 18,200, and he reduced the number of nut sorter and order taker positions by an unspecified amount. (R. at 988–89.) All told, by the end of the second hearing, the vocational expert's testimony established "approximately 30,300 jobs within five different occupations" available for a person with Paula's limitations.[4] (R. at 1042.)

---

[4] Paula argues that "some unspecified number of the 18,200 surveillance system monitors were performed at a greater level of exertion." (Pl. Reply 4; *see also* Pl. Br. 17.) But Paula does not provide a citation to the record for that proposition. And indeed, the ALJ's opinion and the transcript appear to refute this: "[The vocational expert] testified that he still considered [surveillance system monitor] to be unskilled sedentary occupations." (R. at 1041.) At the hearing, immediately after discussing the surveillance monitor jobs, the vocational expert stated: "and that completes my testimony in regards *to sedentary work* that was on that special memo." (R. at 988 (emphasis added).) This strongly suggests that the 18,200 surveillance monitor positions were sedentary.

14

So is 30,300 jobs in the national economy enough? Recall that at step five the burden shifts to the Commissioner to demonstrate that "the claimant possesses the residual functional capacity to perform work that exists in a significant quantity in the national economy." *Weatherbee*, 649 F.3d at 569. But the regulations do not define what "significant" means. And the "Seventh Circuit has not affirmatively established the threshold for the number of jobs in the national economy that qualifies as significant." *John C. v. Saul*, No. 4:19-cv-04111, 2021 WL 794780, at *5 (C.D. Ill. Mar. 2, 2021). This lack of clarity has generated widely varying opinions by district courts. *Compare James A. v. Saul*, 471 F. Supp. 3d 856, 860 (N.D. Ind. 2020) ("14,500 is far below any national number of jobs that the Seventh Circuit Court of Appeals has determined to be significant,"), *and Sally S. v. Berryhill*, No. 2:18-cv-460, 2019 WL 3335033, at *11 (N.D. Ind. Jul. 23, 2019) (120,350 jobs nationally not significant), *with Dorothy B. v. Berryhill*, No. 18-cv-50017, 2019 WL 2325998, at *7 (N.D. Ill. May 31, 2019) (finding 17,700 jobs nationally to be significant), *Iversen v. Berryhill*, No. 16-cv-7337, 2017 WL 1848478, at *5 (N.D. Ill. May 8, 2017) (30,000 significant), *and Joseph M. v. Saul*, No. 18-cv-5182, 2019 WL 6918281, at *17 (N.D. Ill. Dec. 19, 2019) (40,000 significant).

More recently, in *Milhem v. Kijakazi*, 52 F.4th 688 (7th Cir. 2022), the Seventh Circuit recognized that its "case law does not provide a clear baseline for how many jobs" is significant. *Id.* at 696. *Milhem* found 89,000 national jobs to be significant, especially given the court's previous ruling that 140,000 jobs was "well above the threshold for significance." *Weatherbee*, 649 F.3d at 572. And the court cited the

15

decisions of three other circuits for the proposition that 10,000, 25,000, and 32,000 jobs nationally has been found significant. *Milhem*, 52 F.4th at 697 (first citing *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022); then citing *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 529 (9th Cir. 2014); and then citing *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997)). Although 30,300 jobs nationally is about one-third of the number found significant in *Milhem*, out-of-circuit authority suggests that it suffices to carry the Commissioner's step-five burden.[5]

Paula challenges the ALJ's conclusion that there was "no legal basis" for finding that 30,300 jobs was not significant. (Pl. Br. 17.) But that statement is an accurate one: there *is* no binding authority in the Seventh Circuit to suggest that 30,000 jobs nationally is not a significant number. True, district courts have come to varying conclusions. (Pl. Br. 18.) But as discussed, those cases have cut both ways. And of course, ALJs must clarify whether the figures they offer represent national or regional jobs, as the Seventh Circuit has instructed. *See Milhem*, F.4th at 695–96. But the ALJ here discharged that obligation: he clarified that the figures represented jobs on the national level. *See Alaura v. Colvin*, 797 F.3d 503, 517 (7th Cir. 2015) (explaining that ALJs are entitled to rely on national job numbers alone).

Paula correctly recognizes that the Commissioner bears the burden of proving, at step five, that the claimant can perform jobs that exist in significant numbers in the national economy. (Pl. Br. 14 (quoting *Kasarsky v. Barnhart*, 335 F.3d 539, 543

---

[5] Whether Paula is correct that the sorter and order taker positions had shrunk is beside the point. Both positions amounted to only 3,500 jobs, so, even assuming that they had shrunken to zero, the figure would be 26,800 rather than 30,300—a difference this Court finds legally insignificant, for the reasons stated below.

(7th Cir. 2002).) And she reads one case decided by this Court—*John C.*—as requiring the Commissioner to identify "binding authority holding" that 30,000 jobs is significant. (Pl. Reply 6 (quoting *John C.*, 2021 WL 794780, at *5).) Yet she also emphasizes that "there is still no binding authority saying that 30,000 jobs nationally represent a significant number." (Pl. Reply 6.) Paula's reading of *John C.* would therefore ask the Commissioner to pull a rabbit from an empty hat: he would have to point this Court to a case that does not exist. But *John C.* does not stand for that proposition. The Commissioner's step-five burden is not to identify—or to generate—binding caselaw that 30,000 jobs is a significant number; it is to provide substantial evidence that the claimant can perform work that exists in significant numbers in the national economy. *See Dorothy B.*, 2019 WL 2325998, at *7 ("Plaintiff provides no other authority to suggest 17,700 national jobs is insignificant.").

What is more, the Court in *John C.* remanded that case in large part because the ALJ's step-five analysis suffered from "apparent conflicts" between the testimony of the vocational expert and the DOT. *John C.*, 2021 WL 794780, at *6. It was those conflicts—in combination with the 20,000 figure—that led the Court to conclude that the Commissioner did not "sustain[] his burden at step five." *Id.* But here, Paula identifies no conflicts in either the expert testimony or the ALJ reasoning. And indeed, the ALJ explained in considerable detail his step-five analysis, ultimately concluding "that over 30,000 jobs within five different occupations, with one occupation having roughly 18,000 jobs and another occupation having roughly 7,000 jobs, constitutes a significant number of jobs." (R. at 1042.)

17

Accordingly, the Court finds that the ALJ has carried his step-five burden to show that Paula can perform about 30,000 jobs in the national economy. Unless and until the Seventh Circuit says otherwise, that is enough.

## CONCLUSION

IT IS THEREFORE ORDERED that the Commissioner's decision be affirmed. The Clerk is DIRECTED to enter judgment and close this case.

*So ordered.*

Entered this 10th day of June 2026.

s/ Ronald L. Hanna

Ronald L. Hanna
United States Magistrate Judge